# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 04-0491

Jonathan L. Haas, Appellant

v.

R. James Nicholson,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Argued January 10, 2006          Decided   August 16, 2006     )

*Louis J. George,* with whom *Barton F. Stichman*, was on the brief, both of Washington, D.C., for the appellant.

*William L. Puchnick,* with whom *Tim S. McClain,* General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Brian B. Rippel*, Deputy Assistant General Counsel, all of Washington, D.C., were on the brief for the appellee.

Before HAGEL, MOORMAN, and LANCE, *Judges.*

MOORMAN, *Judge*:  The appellant, Jonathan L. Haas, appeals a February 20, 2004, Board of Veterans' Appeals (Board) decision that denied entitlement to service connection for diabetes mellitus, with peripheral neuropathy, nephropathy, and retinopathy as a result of exposure to herbicides during his Vietnam-era service.  Record (R.) at 11; *see* STEDMAN'S MEDICAL DICTIONARY 1211, 1191, 1560 (27th ed. 2000) (defining "neuropathy" as "a disease involving the cranial nerves or the peripheral or autonomic nervous system"; "nephropathy" as "any disease of the kidney"; and "retinopathy" as "noninflammatory degenerative disease of the retina").  The Board determined that although Mr. Haas had served in the waters off the shore of the Republic of Vietnam, such service did not warrant application of the presumption of exposure to herbicides under 38 C.F.R. § 3.307(a)(6)(iii) (2004), which, the Board concluded, required a service member to set foot on land

in the Republic of Vietnam. Mr. Haas did not set foot on land in the Republic of Vietnam. Thus, at issue in this appeal is whether VA's asserted regulatory definition of "service in the Republic of Vietnam" is a permissible interpretation of the authorizing statute, 38 U.S.C. § 1116(f), and whether the Board's interpretation is a reasonable interpretation of VA's regulation, 38 C.F.R. § 3.307(a)(6)(iii). The appellant, initially unrepresented, filed an informal brief. After the appellant obtained counsel in June 2005, both parties filed supplemental briefs and the appellant filed a supplemental reply brief. On January 10, 2006, the parties presented oral argument. The Court has jurisdiction pursuant to 38 U.S.C. §§ 7252 (a) and 7266(a) to review the February 2004 Board decision.

After considering the parties' briefs and oral argument, we hold that (1) 38 U.S.C. §1116(f) is not clear on its face concerning the meaning of the phrase "service in the Republic of Vietnam." Therefore, the statute is ambiguous, and the Secretary may promulgate regulations to resolve that ambiguity so long as the regulations reasonably interpret both the language of the statute and the intent of Congress in enacting the legislation. We further hold (2) that 38 U.S.C. § 1116(f) does not by its terms limit application of the presumption of service connection for herbicide exposure to those who set foot on the soil of the Republic of Vietnam. We hold (3) that the Secretary's regulations, while a permissible exercise of his rulemaking authority, do not clearly preclude application of the presumption to a member of the Armed Forces who served aboard a ship in close proximity to the land mass of the Republic of Vietnam. We hold (4) that the provisions of the VA Adjudication Procedure Manual [hereinafter M21-1] in effect at the time the appellant filed his claim in 2001 entitled him to a presumption of service connection based upon his receipt of the Vietnam Service Medal (VSM). We hold (5) that VA's attempt to rescind that version of the M21-1 provision more favorable to the appellant was ineffective because VA did not comply with the notice and comment requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). And, finally, we hold (6) that if service connection for diabetes mellitus is granted upon remand, secondary service connection must be considered for the veteran's claims of peripheral neuropathy, nephropathy, and retinopathy. For these reasons, the Court will reverse the Board's determination that the appellant was not entitled to the presumption of exposure to herbicides and remand the matter for readjudication consistent with this decision.

2

## I. FACTS

Mr. Haas served on active duty in the U.S. Navy from September 1959 to September 1960, and from May 1963 to June 1970. R. at 15. He later transferred to the Reserve component and retired from the Naval Reserves effective July 1, 1982. R. at 304. During his entrance examination in March 1959, Mr. Haas reported a family history of diabetes, but at that time also stated that he did not have diabetes mellitus. R. at 22. The examiner noted that Mr. Haas was in good health. R. at 23. Throughout his service, Mr. Haas routinely noted a family history of diabetes during his physical examinations, but also reported that he did not suffer from diabetes mellitus. R. at 61, 71, 78, 253.

Mr. Haas was hospitalized from October 4, 1967, to October 10, 1967, at the U.S. Naval Hospital at Subic Bay, Republic of the Philippines, for an upper respiratory infection and inflammation of the right foot. R. at 124-25, 500. During his hospital stay, Mr. Haas was diagnosed as having "acute gouty arthritis with hyperuricemia," and a horseshoe kidney with left pyelocaliectasis. R. at 124; *see* DORLAND'S MEDICAL DICTIONARY 800, 1392 (27th ed. 1988) (defining "hyperuricemia" as "excess of uric acid or urates in the blood; it is a prerequisite for the development of gout and may lead to renal disease"; and "pyelocaliectasis" as "dilation of the kidney pelvis and calices"). The results of a glucose test taken at that time were abnormal. R. at 124, 127.

In an August 1968 service medical report, an examiner reported that Mr. Haas would have to undergo further testing to rule out diabetes mellitus. The examiner further noted that the glucose tolerance test conducted in October 1967 was "mildly abnormal but not significantly and may be a reflection of [Mr. Haas's] obesity." R. at 140. In December 1972, Mr. Haas was found to be physically qualified to continue service. Laboratory tests conducted at that time revealed normal albumin and sugar levels, and normal serology reports. R. at 192. He was also deemed physically qualified for active-duty-for-training service after physical examinations in May 1973, February 1975, August 1976, and September 1977. R. at 200, 238, 257. He was disqualified from active-duty-for-training service in September 1978 after failing to meet weight requirements. R. at 273. In February 1981, Mr. Haas requested a transfer to the "retired list without pay"; his request was granted and deemed effective July 28, 1981. R. at 298. On July 19, 1982, he was transferred to the Retired Reserves, effective July 1, 1982. R. at 304.

In August 2001, Mr. Haas submitted an application for VA disability compensation, requesting service connection for diabetes mellitus, peripheral neuropathy, and loss of eyesight, resulting from "exposure to [A]gent [O]range/radioactive materials" during his service. R. at 313-21. He indicated that these disabilities first manifested sometime in 1980 and that he had received treatment for these conditions at the VA medical center in Phoenix, Arizona. *Id.*

A VA regional office (RO) sent Mr. Haas a letter in August 2001 informing him that in order for the RO to apply the presumption of service connection for diabetes mellitus due to exposure to herbicides during service, he must "have physically served or visited in the Republic of Vietnam, including service in the waters offshore if the conditions of service involved duty or visitation in Vietnam. This means the ship must have come to port in the [Republic of Vietnam] and you disembarked." R. at 323-27. In response to this notice, Mr. Haas took exception to the criteria for "service in the Republic of Vietnam." R. at 329. He reported that he had served on an "ammunition ship and [had] resupplied boats and ships patrolling the coastal water of Vietnam with ammunition, food, stores and fuel. Ammunition ships and tankers did not enter the ports of Vietnam due to the risks of explosion due to enemy fire or sabotage." *Id.* He further noted that he had received four VSMs, and therefore, "served in the Republic of Vietnam without the 'ship going into port in [the Republic of Vietnam] and . . . disembarking.'" *Id.* In September 2001, he contended that "service in the Republic of Vietnam," as defined by 38 C.F.R. § 3.307(a)(6)(iii), must be read to include service in the waters offshore. R. at 331-32. In May 2002, the Phoenix, Arizona, RO denied presumptive service connection for diabetes mellitus with peripheral neuropathy, nephropathy, and retinopathy. R. at 455-60.

In June 2002, Mr. Haas filed a Notice of Disagreement (NOD), and in December 2002, the RO issued a Statement of the Case (SOC), maintaining its denial of his claim on the basis that Mr. Haas did not have service in the Republic of Vietnam in accordance with the definition set forth in VA General Counsel Precedent Opinion (G.C. Prec.) 27-97 (July 23, 1997). R. at 521-39 (the Court notes that both the RO decision and the SOC refer to a VA General Counsel precedent opinion that was published in September 1996; however, the only VA General Counsel precedent opinions of record regarding the issue of what constitutes service in the Republic of Vietnam are G.C. Prec. 7-93 (1993) and G.C. Prec. 27-97 (1997)). Mr. Haas filed an appeal with the Board in January 2003,

4

asserting that VA's interpretation of "service in the Republic of Vietnam," was "arbitrary and capricious, and . . . contrary to regulation and law." R. at 543.

In July 2003, Mr. Haas testified before a member of the Board. R. at 560-71. Mr. Haas stated that during his tour aboard the U.S.S. *Mount Katmai*, he often saw large clouds of chemicals being dropped by aircraft over the forests. He further stated: "[T]hese large clouds would drift out over the water because of the prevailing offshore winds, and they would engulf ships, my ship in particular. Now you could see the chemicals, you could taste them, smell them, and they landed on your skin." R. at 562. Mr. Haas reported that his exposure occurred in 1966 or 1967. R. at 563. He noted that he was on an ammunition ship about "420, [4]25 feet [long][1]" for approximately 20 days at a time, for eight months during each of his two deployments. R. at 564-65. He testified that he would have to navigate in close proximity to the shoreline to deliver supplies because the "boats that were doing the patrolling could not leave the stations more than a certain amount of time[.] . . . [T]hey couldn't steam out 5 miles to pick up supplies." R. at 565. The Board subsequently issued the decision on appeal here, denying presumptive service connection for diabetes mellitus on the basis that Mr. Haas never set foot on land in the Republic of Vietnam. The Board did not evaluate Mr. Haas's claim under the direct service-connection provisions of VA regulations. R. at 1-16.

## II. CONTENTIONS ON APPEAL

On appeal, the appellant makes three assertions of error. First, he contends that VA's regulatory definition of what constitutes "service in the Republic of Vietnam" contradicts the plain meaning of the authorizing statute, 38 U.S.C. § 1116(f). Second, he asserts that if the Court finds the language of 38 U.S.C. § 1116(f) to be ambiguous, VA's gap-filling regulation, 38 C.F.R. § 3.307(a)(6)(iii), is not a permissible interpretation of what may constitute "service in the Republic of Vietnam." Finally, he asserts that VA's M21-1 provisions addressing the application of the presumption of service connection for herbicide exposure are substantive in nature and have the force and effect of law, and that VA committed error by retroactively applying the February 2002

---

1. *See* NavSource Online: Service Ship Photo Archive, AE-16 *Mount Katmai*, *at* http://www.navsource.org/archives/09/0516.htm (last visited Aug. 10, 2006) (noting the length of the U.S.S. *Mount Katmai* as 459 feet).

5

version of M21-1, paragraph 4.24(g). As a result, the appellant asserts that the February 2004 Board decision should be reversed.

The Secretary first asserts that the term "Republic of Vietnam" contained in 38 U.S.C. § 1116(f) is not ambiguous given the language and the context within which the statute was enacted; however, if the Court concludes that the term is ambiguous, then VA's regulatory definition of what constitutes service in the Republic of Vietnam is a permissible and reasonable interpretation of that language. Second, he maintains that the M21-1 provisions at issue in this case are interpretive rather than substantive in nature; thus, they do not have the force and effect of law and do not dictate an award of presumptive service connection in this case. The Secretary asserts that if the Court finds that the M21-1 provisions are substantive, however, that under any version of the M21-1 provisions addressing presumptive service connection for herbicide exposure, the appellant's own statements are sufficient to rebut the presumption. Finally, the Secretary concedes that a remand is necessary for the Board to consider entitlement to service connection for diabetes mellitus on a direct service-connection basis.

### III. ANALYSIS

#### A. Standard of Review

At issue in this case is the meaning of the statute and regulations governing presumptive exposure to certain herbicide agents as the result of service in the Republic of Vietnam and what constitutes "service in the Republic of Vietnam."[2] These are questions of law that the Court reviews

---

2. The Court notes that in our recent decision in *Pratt v. Nicholson* , __ Vet.App. __, __, No. 04-0451, slip op. at 5 (Aug. 11, 2006), we held that the plain language of the phrase "in the Republic of Vietnam," as used in 38 U.S.C. § 1831(2), was sufficiently clear to resolve the question presented. Accordingly, we rejected the appellant's claim that the veteran's service in the San Diego, California, area qualified the appellant for benefits under 38 U.S.C. § 1805. *Id.* Our conclusion in this case that the statutory language is ambiguous as to service in the waters off the coast of Vietnam is not in conflict with *Pratt*. Rather, these two cases illustrate the principle that statutory ambiguity is not an absolute conclusion, but is a case-by-case determination as to whether the language answers the particular question presented. Hence, statutory language that plainly answers one question may still be ambiguous when applied to another.

de novo. In deciding these issues, the Court must first analyze the language of the authorizing statute and determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984); *see* 38 U.S.C. § 7261(a) (providing the Court's scope of review); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993); *see also Trilles v. West*, 13 Vet.App. 314, 321 (2000) (en banc). If the text of the statute speaks unambiguously directly to the question at issue, then "that is the end of the matter; for the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43; *see also Gardner v. Derwinski*, 1 Vet.App. 584, 586-87 (1991) (addressing principles of statutory construction and noting that, where a statute has a plain meaning, the Court shall give effect to that meaning), *aff'd sub nom. Brown v. Gardner*, 513 U.S. 115 (1994); *see also Meeks v. West,* 12 Vet.App. 352, 354 (1999) ("'[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole.'" (quoting 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.01 (5th ed. 1992))). If, however, the statute is silent as to the matter at issue, VA's attempt at filling that gap "will generally be sustained as long as it reflects a permissible construction of the statute." *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123 (1987); *see Chevron*, 467 U.S. at 842-43; *Felton v. Brown*, 4 Vet.App. 363, 370 (1993).

### B. Statutory Provision

#### 1. Plain Language of 38 U.S.C. § 1116(f)

Section 1116(f), title 38, of the U.S. Code, provides:

> For purposes of establishing service connection for a disability or death resulting from exposure to a herbicide agent, including a presumption of service-connection under this section, a veteran who, during active military, naval, or air service, *served in the Republic of Vietnam* during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent containing dioxin . . . and may be presumed to have been exposed during such service to any other chemical compound in an herbicide agent, unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during that service.

*Id*. (emphasis added). The precise question at issue in this case is the meaning of the phrase "served in the Republic of Vietnam." There are many ways in which to interpret the boundaries of a sovereign nation such as the former Republic of Vietnam, which is now part of the Socialist

7

Republic of Vietnam.[3]  For instance, such boundaries can be defined solely by the mainland geographic area.  *See* CIA WORLD FACTBOOK, Vietnam, *available at* www.cia.gov/cia/publications /factbook/geos/vm.html (last visited Mar. 3, 2006) (noting the land boundaries of Vietnam as 4,369 kilometers).  The present boundaries of the Republic of Vietnam can also be construed to include the surrounding islands it controls in the Hoang Sa and Truong Sa archipelagos.  *See* Embassy of the Socialist Republic of Vietnam in the United States of America, Maps of Vietnam, *at* http://www. vietnamembassy-usa.org/learn_about_ vietnam/geography/maps (last accessed Mar. 2, 2006). Using international law principles, the Republic of Vietnam could be defined further to include its territorial seas, extending 12 nautical miles from its coastline, or even as far as its exclusive economic zone, extending its boundary 200 nautical miles beyond the coastline, and further to include its airspace.  *See* United Nations Convention on the Law of the Sea, Part II, Dec. 10, 1982, *at* http://www.un.org /Depts/los/convention_agreements/texts /unclos/closindx.htm (last visited Mar. 2, 2006) ("The sovereignty of a coastal State extends, beyond its land territory and internal waters and, in the case of an archipelagic State, its archipelagic waters, to an adjacent belt of sea, described as the territorial sea.  This sovereignty extends to the air space over the territorial sea as well as to its bed and subsoil."); *see also* United Nations Convention on the Law of the Sea, Participants, *at* http://untreaty.un.org/ENGLISH/bible/englishinternetbible/ partI/chapterXXI/treaty6.asp (last visited Mar. 2, 2006) (noting that the Republic of Vietnam signed the Convention on Dec. 10, 1982, and ratified it on July 25, 1994); *cf.* United Nations Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, Participants, *at* http://untreaty.un.org/ENGLISH/bible/englishinternetbible

---

3. In 1954, pursuant to the Geneva Agreement on Vietnam, the country was temporarily partitioned into North and South Vietnam at the 17th parallel; the northern part was referred to as the "Democratic Republic of Vietnam," with its capital in Hanoi, and the southern part was known as the Republic of Vietnam, with its capital in Saigon.  In the 1960s, U.S. military troops were sent to South Vietnam to support the Saigon government in maintaining its independence from North Vietnam.  In 1973, after signing the Paris Agreement, the United States began to withdraw its troops, and in the spring of 1975, the northern and southern parts of Vietnam were unified.  On April 25, 1976, the country, now including both the northern and southern parts of the territory, was renamed the Socialist Republic of Vietnam.  *See* Embassy of the Socialist Republic of Vietnam in the United States of America, History of Vietnam, *at* http://www.vietnamembassy-usa.org/learn_about _vietnam/history (last accessed Mar. 20, 2006).

/partI/chapter XXI/treaty1.asp (last accessed June 30, 2006) (reporting that the United States signed this treaty on Sept.15, 1958, and ratified the treaty on Apr. 12, 1961, thus adopting the 12 nautical mile standard for its territorial seas, and the 200 nautical mile standard for its contiguous zone).

The appellant argues that the text of this statute is clear, that the phrase "Republic of Vietnam" must be read, in accordance with Presidential Proclamation 5928, 54 Fed. Reg. 777 (Jan. 9, 1989) to include both the nation's land mass and territorial seas. Appellant's Supplemental Brief at 6 (noting that the territorial sea of a sovereign nation extends 12 nautical miles). The appellant argues that the Court must presume that when Congress enacted section 1116(f), it knew the "widely accepted territorial definition of a sovereign country," and that by using the phrase "in the Republic of Vietnam," it intended to adopt that definition. *Id.* In response, the Secretary maintains that because the regulation first defining "service in the Republic of Vietnam" (38 C.F.R. § 3.311a(a)(1) (1985)), predated the enactment of 38 U.S.C. § 1116(f), the Court must presume that Congress was aware of VA's then-extant regulatory provision, and therefore, it is rather the agency's regulatory definition that Congress must have intended to adopt.

The Court notes, however, that at the time section 1116(f) was enacted in 1991, there were two extant VA regulations defining "service in the Republic of Vietnam." *Compare* 38 C.F.R. § 3.311a(a)(1) (1985) (defining "service in the Republic of Vietnam" as "includ[ing] service in the waters offshore and service in other locations, if the conditions of service involved duty or visitation in the Republic of Vietnam"), *with* 38 C.F.R. § 3.313 (1990) (entitled "Claims based on service in Vietnam" and defining "service in the Republic of Vietnam" as including "service in the waters offshore, or service in other locations if the conditions of service involved duty or visitation in Vietnam"). Based on the different syntax and punctuation used in these regulations supposedly using the same definition for Vietnam-era service, it is easy to see how one could interpret and apply this definition differently in practice. For example, based on the placement of the comma in § 3.311a(a)(1) (1985), the clause "if the conditions of service involved duty or visitation in the Republic of Vietnam" can be read to modify both "service in the waters offshore" and "service in other locations," although even that interpretation is not certain to flow from the language and syntax. The same clause, however, in § 3.313 "Claims based on service in Vietnam," based on the comma placement, can be read to modify only "service in other locations;" thus, service in the waters

offshore could constitute service in the Republic of Vietnam regardless of whether the veteran visited or had duty on land in Vietnam. It is further unclear what the reader should conclude from the use of "and" after "waters offshore" in § 3.311a(a)(1), and the use of "or" after "waters offshore" in § 3.313. The Court cannot conclude, therefore, based on these varying definitions, that Congress intended to adopt either the international law definition as the appellant contends, or, as the Secretary asserts, the regulatory definitions extant at the time that the Agent Orange Act of 1991 was enacted. Thus, the Court cannot conclude that the text of the statute is clear on its face. *See Chevron, supra.*

### 2. Legislative History and Context of 38 U.S.C. § 1116(f)

We must next look to the legislative history of this statute to discern whether Congress otherwise specified its intent regarding the meaning of the phrase "service in the Republic of Vietnam." *See Blum v. Stenson*, 465 U.S. 886, 896 (1984) (noting that discerning Congress's intent can be accomplished by reviewing the legislative history of a statute). The meaning of the statute as a whole also warrants scrutiny. *See Moreau v. Brown*, 9 Vet.App. 389, 396 (1996) ("[I]t is fundamental that sections of a statute should not be read in isolation from the context of the whole act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962))); *see also Cottle v. Principi*, 14 Vet.App. 329, 334 (2001); *Meeks*, 12 Vet.App. at 354; *Talley v. Derwinski*, 2 Vet.App. 282, 286 (1992). As noted above, after such review, if the intent of Congress is unclear, then we must defer to VA's construction of the statutory term, if it is a permissible interpretation. *See Chevron, supra*; *see also Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002).

Although current section 1116(f) was not enacted until 1991, in 1983 Congress first addressed the issue of creating a statutory presumption of service connection for diseases resulting from Agent Orange exposure. *See* Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 (codifying current section 1116(f) at 38 U.S.C. § 316(a)(3)); *see also* H.R. REP. NO. 98-592 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4449 (detailing the history of H.R. 1961, the precursor of Public Law 98-542, the Veterans' Dioxin and Radiation Compensation Standards Act). In March 1983, H.R. 1961 was introduced in an effort to "authorize temporary monetary benefits pending the results and receipt of the epidemiological study mandated by Public Law 96-151 for Vietnam veterans who

suffer from soft-tissue sarcoma, porphyria cutanea tarda . . . and chloracne." 1984 U.S.C.C.A.N. 4449. The 1983 bill, in its original form, would have "provid[ed] a statutory presumption of service-connection for *any* veteran who *served in Southeast Asia during the Vietnam era* and who later is shown to have one of the conditions identified in the bill." *Id.* (emphasis added). In further reporting the results of its previous oversight investigations, the U.S. House Committee on Veterans' Affairs (hereinafter the Committee) recognized that the main issues that still needed to be addressed were not the toxicity of the dioxin contained in Agent Orange, but rather "how much exposure to the dioxin was experienced by Vietnam veterans, how much exposure can be expected to produce long-term health effects, and at what rate, or frequency, if any, are these effects being experienced by veterans who served in Southeast Asia." *Id.* at 4451. Until these questions could be answered by the various studies that Congress had mandated in Public Laws 96-151 and 97-72, the Committee proposed the temporary payments set forth in H.R. 1961. *Id.* at 4453.

In October 1984, Congress enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Public Law 98-542, based on H.R. 1961. In this act, Congress recognized that there was scientific and medical uncertainty regarding the long-term effects of exposure to Agent Orange, and noted that there was evidence that the diseases chloracne, porphyria cutanea tarda, and soft tissue sarcoma were associated with herbicide exposure. *See* Pub. L. No. 98-542, §2(2), (5), 98 Stat. 2725 (1984). Further observing that VA had not promulgated regulations setting forth guidelines for the adjudication of claims based on exposure to Agent Orange, and noting the unique differences between these types of claims and claims for service connection based on an injury in service, Congress then authorized VA to "prescribe regulations to establish guidelines and (where appropriate) standards and criteria for the resolution of claims for benefits . . . [where] the claim of service connection is based on a veteran's exposure during *service . . . in the Republic of Vietnam* during the Vietnam era to a herbicide containing dioxin." Pub. L. No. 98-542, §5(a)(1)(A), 98 Stat. 2727 (1984) (emphasis added). Finally, the act amended 38 U.S.C. § 354, adding note (a)(1) to allow for "interim benefits for disability or death in certain cases." This note provided:

In the case of a veteran –

(A) who served in the active military, naval, or air service *in the Republic of Vietnam* during the Vietnam era; and

11

(B) who has a disease described in subsection (b) that became manifest within one year after the date of the veteran's most recent departure from the Republic of Vietnam during that service, the Administrator shall (except as provided in subsection (C)) pay a monthly disability benefit to the veteran in accordance with this section.

Pub. L. No. 98-542, §9, 98 Stat. 2732 (1984) (emphasis added).

Although the original bill, H.R. 1961, would have provided the temporary payment to Vietnam-era veterans who served in "Southeast Asia," as noted above, in the provision ultimately passed by Congress, that term was replaced with "Republic of Vietnam." *Compare* H.R. REP. NO. 98-592, *as reprinted in* 1984 U.S.C.C.A.N. 4449 (noting that the statutory presumption would be afforded to veterans "who served in Southeast Asia during the Vietnam era"), *with* Pub. L. No. 98-542, § 9, 98 Stat. 2732 (1984). There is no explanation in the 1984 Committee Report for this change in the text.

In addition, the 1984 act focused mainly on the promulgation of VA regulations, to include the requirement that the regulations be promulgated through the public review and comment process dictated by the APA, 5 U.S.C. § 553, and that the regulations include "a requirement that a claimant filing a claim based upon . . . exposure to a herbicide containing dioxin . . . may not be required to produce evidence substantiating the veteran's exposure during active military, naval, or air service if the information in the veteran's service records and other records of the Department of Defense is not inconsistent with the claim that the veteran was present where and when the claimed exposure occurred." Pub. L. No. 98-542, §5(b)(3)(B), 98 Stat. 2729 (1984). As related to any regulation promulgated pursuant to this act, Congress explicitly adopted the definitions for "Vietnam era," "veteran," "service-connected," and "active military, naval, or air service," as set forth in 38 U.S.C. § 101. Pub. L. No. 98-542, § 9(g), 98 Stat. 2733 (1984). The act, however, did not define what constitutes "service in the Republic of Vietnam." *Id.*

In order for the Court to trace further the legislative history of 38 U.S.C. § 1116(f), it is necessary to briefly discuss the subsequent regulatory actions of the Secretary following the 1984 act and other subsequent procedural history that prompted further legislative action on this issue. Pursuant to the 1984 congressional mandate, in April 1985 VA proposed 38 C.F.R. § 3.311a, "Dioxin Rule," which became effective on September 25, 1985. This regulation, among other things,

defined "service in the Republic of Vietnam" as "includ[ing] service in the waters offshore and service in other locations, if the conditions of service involved duty or visitation in the Republic of Vietnam." *See* 50 Fed. Reg. 34,452, 34,458 (Aug. 26, 1985). In its notice of proposed rulemaking, VA recognized that more than 2.4 million U.S. military personnel served in Vietnam, and although it could not pinpoint exactly who may have been exposed to Agent Orange, it acknowledged that many of these individuals were deployed in or near locations where Agent Orange was sprayed. *See* 50 Fed. Reg. 15,848, 15,849 (Apr. 22, 1985). Thus, VA stated that "service in the Republic of Vietnam" would "encompass services elsewhere if the person concerned actually was in the Republic of Vietnam, however briefly." *Id.* The notice contained no further indication as to what constituted "actually . . . in the Republic of Vietnam." *Id.* VA issued the final regulation without change, noting further that the presumption was based on the extreme difficulty of tracking troop movements to determine exactly who may have been exposed to Agent Orange. *See* 50 Fed. Reg. 34,452, 34,455 (Aug. 26, 1985).

In February 1987, a group of Vietnam-era veterans and surviving spouses filed a class action suit in the United States District Court, Northern District of California, alleging that this final regulation was invalid because it not only violated provisions of the 1984 act, but in the process of promulgating the regulation, VA also violated provisions of the APA, 5 U.S.C. §§ 701-706, and the fifth amendment to the U.S. Constitution. *See Nehmer v. U.S. Veterans' Administration*, 712 F. Supp. 1404, 1410-11 (N.D. Cal. 1989) (noting that the court could exercise jurisdiction because the action was filed prior to the enactment of the Veteran's Judicial Review Act, which vested jurisdiction over statutory challenges to VA rulemaking filed after September 1, 1989, with the Federal Circuit). The court held that the "cause and effect test" employed by VA in 38 C.F.R. § 3.311a(d) to determine the relationship between dioxin exposure and diseases was inconsistent with both VA's prior practice and the purpose of the 1984 act. *Id.* at 1418. The court also held that the 1984 act required VA to apply the benefit of the doubt doctrine in the aggregate rulemaking process. In reaching this conclusion, the court relied on the statement of Senator Simpson, in which he asserted that the "[1984] Act was intended to ensure that veterans 'have their exposure claims adjudicated under uniform and consistent regulations that incorporate rational scientific judgments, as opposed to the prior system, in which the claims are 'committed to the sound judgment of the VA's

13

adjudication officers' who decide them on 'a case-by-case basis.'" *Id.* at 1422 (citing statement of Senator Simpson, 130 CONG. REC. S13591 (daily ed. Oct. 4, 1984); *cf. King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991) (holding that veterans benefits statutes should be construed liberally for their beneficiaries). In its conclusion, the court stated that "[t]he Administrator both imposed an impermissibly demanding test for granting service connection for various diseases *and* refused to give veterans the benefit of the doubt in meeting that standard." *Nehmer,* 712 F. Supp. at 1423. The court thus invalidated 38 C.F.R. § 3.311a(d), the portion of the regulation that denied service connection for all diseases other than chloracne, and voided all decisions denying benefits under this regulation. *Id.*

Following VA's regulatory action and the U.S. District Court's decision in *Nehmer*, Congress ultimately enacted the Agent Orange Act of 1991. *See* Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11; *see also* Statements on Introduced Bills and Joint Resolutions, Veterans' Agent Orange Exposure and Vietnam Service Benefits Act of 1989, 135 CONG. REC. S6413 (daily ed. June 8, 1989) (noting that a proposed bill, S. 1153, establishing presumptive service connection based on exposure to Agent Orange, was designed to "complement the efforts Secretary Derwinski will be making through the new Agent Orange Regulations . . . . This process will allow the VA's regulatory procedure to go forward and give NHL [non-Hodgkin's lymphoma] and STS [soft-tissue sarcoma] victims the benefit of the doubt in the meantime."); Amendment to S. 13, The Veteran's Benefits and Health Care Act of 1989, 135 CONG. REC. S12,628 (daily ed. Oct. 4, 1989). As stated by Representative Dan Burton, this legislation served to codify a prior VA administrative decision that deemed three diseases service connected for compensation purposes. *See* 137 CONG. REC. E390-03 (daily ed. Jan. 29, 1991) (statement of Rep. Burton). The 1991 act also required that the National Academy of Sciences conduct a comprehensive review of "all the available and future evidence on the long-term health effects of exposure" to herbicides, and that the Secretary, upon receipt of this review, determine whether "any further presumptions for any disease should be granted." *Id.*

Although the 1991 act focused mainly on addressing the issues raised in *Nehmer*, *supra*, it also codified, in similar form, the 1984 note to 38 U.S.C. § 354 at 38 U.S.C. § 316(a)(3), which provided:

14

For the purposes of this subsection, a veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the Vietnam era and has a disease referred to in paragraph (1)(B) of this subsection shall be presumed to have been exposed during such service to an herbicide agent containing dioxin or 2,4-dichlorophenoxyacetic acid, and may be presumed to have been exposed during such service to any other chemical compound in an herbicide agent, unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during that service.

Pub. L. No. 102-4, §2, 105 Stat. 111; *see also* Veterans Education and Benefits Expansion Act of 2001, Pub. L. No.107-103, § 201(c)(1)(A) (redesignating provision 38 U.S.C. § 316(a)(3) as 38 U.S.C. § 1116(f)). The legislative history of the 1991 act, however, is silent concerning what constitutes "service in the Republic of Vietnam." Rather, it indicates Congress's intent to ensure that a fair and independent system was established to determine the relationship between herbicide exposure and the manifestation of certain diseases. Thus, after reviewing the plain text of the statute, in concert with the legislative history of both the 1984 act and the Agent Orange Act of 1991, the Court cannot conclude that the intent of Congress is so clear as to require either an interpretation that "service in the Republic of Vietnam" is limited solely to Vietnam's mainland, or that such service necessarily includes service in Vietnam's territorial seas.

### C. VA's Regulatory Provisions

#### 1. Chevron *Deference*

The Secretary has attempted to resolve the ambiguity in 38 U.S.C. § 1116(f) through regulation 38 C.F.R. § 3.307(a)(6)(iii), as interpreted in subsequent VA General Counsel Precedent opinions 7-93 and 27-97, and M21-1 provisions, dated from 1990. Given the ambiguity of the statute, VA is permitted to issue regulations in order to resolve the ambiguity, subject, however, to the requirement that such regulations express a permissible interpretation of the statute.[4] If the

---

4. It is noteworthy that the U.S. Supreme Court's decision in *Brown v. Gardner*, 513 U.S. at 118, does not appear to apply in this instance. In *Terry v. Principi*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) observed that the principle enunciated in *Brown* is "a canon of statutory construction that requires that resolution of interpretive doubt arising from statutory language be resolved in favor of the veteran." 340 F.3d 1378, 1384 (Fed. Cir. 2003). The Federal Circuit then concluded that the canon "does not affect the determination of whether an agency's regulation is a permissible construction of a statute." *Id.*

regulations meet this test, they will be afforded *Chevron* deference. Based on the following, the Court concludes that the regulation, on its face, is ambiguous regarding whether service on the land in Vietnam is required for the presumption to apply.

In defining "service in the Republic of Vietnam" before the Court, the Secretary has used interchangeably the definitions in 38 C.F.R. § 3.307(a)(6)(iii) and § 3.313(a), thus implying that there is no difference in the meaning of this definition as it appears in the separate regulations. *Compare* Secretary's Brief (Sec'y Br.) at 13 (relying on the construction of §3.313 to define service in the context of applying the presumption of exposure to herbicides), *with* Secretary's Supplemental Brief (Sec'y Suppl. Br.) at 22 (relying on §3.307(a)(6)(iii)); *see also Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (relying on litigation documents to determine agency's interpretation). Upon reviewing the construction of these two provisions, however, the Court cannot conclude the same. As noted above, for example, 38 C.F.R. §3.307(a)(6)(iii) defines "service in the Republic of Vietnam" as including "service in the waters offshore *and* service in other locations if the conditions of service involved duty or visitation in the republic of Vietnam," while 38 C.F.R. § 3.313, which is entitled "Claims based on service in Vietnam," defines such service as "service in the waters offshore*, or* service in other locations if the conditions of service involved duty or visitation in Vietnam." (emphasis added). Although similar wording is used in these regulations, the construction of both definitions, notably the comma placement in §3.313 and the use of different conjunctions, is quite different. When read without the aid of the Secretary's assertion as to the underlying meaning of this phrase, it is not clear what kind of service is meant to be included for application of the presumption of exposure to herbicides. The varying constructions of this phrase only serve to heighten the ambiguity of the regulatory language. Thus, based on the construction of the regulations, the Court concludes that the Secretary merely has replaced statutory ambiguity with regulatory ambiguity and *Chevron* deference will not be afforded. *See Smith (Ellis) v. Nicholson*, 451 F.3d 1344, 1350 (Fed. Cir. 2006).

In situations such as this, VA's interpretation of its own regulation "becomes 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Smith (Ellis)*, 451 F.3d at 1350 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) and maintaining that such deference is afforded even in cases where the agency announces its interpretation in litigation

documents). Further, as the U.S. Supreme Court noted in *Martin v. Occupational Safety and Health Review Commission*, 499 U.S. 144, 150-51 (1991), where "'the meaning of [regulatory ] language is not free from doubt,' the [Court] should give effect to [VA's] interpretation so long as it is 'reasonable,' that is, so long as the interpretation 'sensibly conforms to the purpose and the wording of the regulations.'" *Id.* (quoting *Ehlert v. United States*, 402 U.S. 99, 105 (1971) and *N. Ind. Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of Am., Inc.*, 423 U.S. 12, 15 (1975)). In determining whether VA's interpretation of its regulation is "reasonable," the Court will consider, among other things, the "timing and consistency of the agency's interpretation," *Batterton v. Francis*, 432 U.S. 416, 425-26 n.9 (1977); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (maintaining that an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is "'entitled to considerably less deference' than a consistently held agency view" (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981))); the "thoroughness evident in its consideration, [and] the validity of its reasoning," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[R]ulings, interpretations, and opinions . . . while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment . . . properly resort[ed] [to] for guidance. The weight of such a judgment . . . will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."*)*. For the following reasons, the Court concludes the interpretation offered to the Court by VA of its regulatory definition of what constitutes "service in the Republic of Vietnam" is inconsistent with prior, consistently held agency views, plainly erroneous in light of its interpretation of legislative history, and unreasonable as an interpretation of VA's own regulations. Thus, the current interpretation will not be afforded deference. *See Cardoza-Fonseca*, *Bowles*, and *Skidmore*, all *supra;see also Smith (Ellis), supra.*

### 2. Inconsistent Regulatory Interpretation

As noted earlier, an "agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Cardoza-Fonseca,* 480 U.S. at 446 n.30; *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 n.11 (1979). After reviewing VA's M21-1 provisions, it is clear to the Court that the most recent interpretation of § 3.307(a)(6)(iii), that service in Vietnam requires that a veteran actually set foot

on land, conflicts with VA's past policy in determining "service in the Republic of Vietnam" for application of the presumption of exposure to herbicides.

In November 1991, VA issued M21-1, part III, paragraph 4.08(k)(1)-(2). This provision stated:

> (1) It may be necessary to determine if a veteran had "service in Vietnam" in connection with claims for service connection for non-Hodgkins lymphoma, soft-tissue sarcoma and chloracne. . . . In the absence of contradictory evidence, "service in Vietnam" will be conceded if the records shows [sic] that the veteran received the Vietnam Service Medal.
>
> (2) If a veteran who did not receive the Vietnam Service Medal claims service connection for non-Hodgkin's lymphoma, soft-tissue sarcoma or chloracne and alleges service on a ship in the waters offshore Vietnam, review the record for evidence that the ship was in the vicinity of Vietnam for some significant period of time (i.e., more than just in transit through the area). If the veteran cannot produce evidence that the ship was in the waters offshore Vietnam, contact the Compensation and Pension Service Projects Staff. Be prepared to furnish the name of the ship, the number of the ship, and the dates that it is alleged to have been in the waters offshore Vietnam. Central Office will attempt to obtain confirmation from the Department of Defense.

*Id.*

It appears to the Court that this provision remained in effect throughout the promulgation and even after the final publication of 38 C.F.R. § 3.307(a)(6)(iii), which thus concedes the application of the presumption based upon the mere receipt of the VSM, without any additional proof that the veteran actually set foot on land in the Republic of Vietnam. Furthermore, even in the absence of a veteran's receipt of the VSM, this provision requires VA adjudicators to review the record for evidence that the veteran's "ship was in the vicinity of Vietnam for some significant period of time." Based on this language, it cannot be concluded, as the Secretary would urge us to conclude, that VA's longstanding interpretation of what constitutes service in Vietnam has been to exclude service in the waters offshore unless the veteran had duty or visitation on land. If that were the case, there would be no requirement to examine whether a ship "was in the vicinity of Vietnam for some significant period of time" because such evidence would be irrelevant under the interpretation that VA now urges on the Court. *See* Appellee's Opposed Motion to Correct Mistake at Oral Argument Dated January 10, 2006, at 2 (asserting that service in Vietnam would never be conceded under any

18

provision of the M21-1 if there was "evidence to the contrary," including the veteran's own statements that he never set foot on land in the Republic of Vietnam); *see also* M21-1, pt. III, para. 4.08(k)(1)-(2) (Nov. 8, 1991); M21-1, pt. III, para. 4.24(g)(1)-(2), change 23 (Oct. 6, 1993); M21-1, pt. III, para. 4.24(g)(1)-(2), change 41 (July 12, 1995); M21-1, pt. III, para. 4.24(g)(1)-(2), change 76 (June 1, 1999).

Furthermore, this provision was amended in 1995, reflecting the holding of a 1993 VA General Counsel precedent opinion in which VA determined that individuals who participated only in high altitude flights over the Republic of Vietnam and received the VSM as a result of such service would not be entitled to the presumption. *See* G.C. Prec. 7-93 (maintaining that these veterans were excluded from the scope of the regulatory definition because they did not share the same experiences as those who served in Vietnam *or in the waters offshore of Vietnam*). This version of M21-1, part III, paragraph 4.24(g), still allowed for application of the presumption based upon the receipt of the VSM and also required VA to conduct additional development in cases in which the veteran served on a ship in the waters offshore of Vietnam but did not receive the VSM, thus allowing for the inference that the presumption would be applicable in cases where a veteran served in the waters offshore of Vietnam and received a VSM for such service, but never had duty or visited on land in the Republic of Vietnam as the Secretary now asserts is required. *Compare* M21-1, pt. III, para. 4.24(g)(1)-(2), change 41 (July 12, 1995) (noting that this version was published after the publication of § 3.307(a)(6)(iii) (1994)), *with* 38 C.F.R. § 3.307(a)(6)(iii) (1994) (defining "service in the Republic of Vietnam"). Thus, it appears that the M21-1 provision contains additional criteria not present in the regulation, 38 C.F.R. § 3.307(a)(6)(iii), that mandate the application of the presumption of service connection. Therefore, contrary to the Secretary's arguments, it appears that it was the longstanding policy of VA to award service connection on a presumptive basis in cases in which the veteran served in waters offshore and received the VSM, without regard to the veteran's physical presence on land in Vietnam.

### 3. Plainly Erroneous Regulatory Interpretation

The Court also concludes that VA's current interpretation of its regulatory definition is based on a misguided and plainly erroneous review of the legislative history of 38 U.S.C. § 101(29), which sets forth the period for Vietnam-era service, and which VA avers supports its conclusion that

Congress intended to limit the period to cover only "those veterans who actually served within the borders of the Republic of Vietnam," and, thus, "service in the Republic of Vietnam" must also be limited to those veterans who served on the land mass of Vietnam. *See* G.C. Prec. 27-97; *see also Bowles*, *supra* (noting that an agency interpretation of a regulatory provision controls unless it is "plainly erroneous or inconsistent"); *Smith (Ellis), supra*. This history is set forth in VA General Counsel precedent opinion 27-97. Although the Board is bound by such opinions, the Court is not. *See* 38 U.S.C. § 7261; *see also Theiss v. Principi*, 18 Vet.App. 204, 210 (2004)*.*

The statutory provision discussed in VA General Counsel precedent opinion 27-97, 38 U.S.C. §101(29), was amended in 1996 with the passage of the Veterans' Benefits Improvements Act, Pub. L. No. 104-275, § 505, 110 Stat. 3322, 3341 (1996). In introducing this amendment to the Senate, Senator Simpson stated that the statutory definition of Vietnam-era service extant at the time only covered service from August 5, 1964 (the date of the Gulf of Tonkin resolution), forward, thus excluding those troops who were in Vietnam as early as February 28, 1961, participating in combat missions. 142 CONG. REC. S11,774, 11,779 (daily ed. Sept. 28, 1996). He noted that it was "entirely appropriate that [VA] benefits be extended to those who actually faced peril in Vietnam before that war's 'legal' starting date." *Id.* Similarly, the Senate reported that, for the purpose of section 1116(f), the appropriate period of service would start from January 9, 1962, the date on which the use of herbicides and defoliants in Vietnam began. *See* S. REP. NO. 104-371 (1996), as *reprinted in* 1996 U.S.C.C.A.N. 3,762, 3,772. Thus, Congress determined that "benefits that are premised on presumed exposure to defoliants and herbicides shall be available to all who served in the Republic of Vietnam when such materials were present there, but that they not be extended to those who served in the Republic of Vietnam only before such materials were introduced." *Id.* Thus, contrary to the Secretary's assertion, this amendment was not based on Congress's intent to focus solely on ground forces, but rather it was meant to encompass all veterans who may have been at risk for exposure based on the time frame during which those herbicides and defoliants were sprayed in the Republic of Vietnam.

Furthermore, even if it is a correct interpretation of section 1116(f), this VA General Counsel precedent opinion, limited to a specific type of service – service on a deep water vessel offshore of Vietnam – is inapplicable to the appellant's claim. This opinion cannot be read to further exclude

another type of service that was not contemplated by VA in General Counsel precedent opinion 27-97, service such as that described by the appellant in his uncontradicted testimony, that his ship sailed in close proximity to the shore, yet he never set foot on land. Using VA's risk-of-exposure test outlined in its June 2001 notice of final rulemaking, given the spraying of Agent Orange along the coastline and the wind borne effects of such spraying, it appears that these veterans serving on vessels in close proximity to land would have the same risk of exposure to the herbicide Agent Orange as veterans serving on adjacent land, or an even greater risk than that borne by those veterans who may have visited and set foot on the land of the Republic of Vietnam only briefly. *See* 66 Fed. Reg. 23,166. This type of service may reasonably be equated to that of the veteran serving on a vessel operating in the inland waterways of the Republic of Vietnam without having set foot on land, contrary to the Secretary's assertions made during oral argument.[5] The Secretary has provided no rational distinction between these types of service and the Court can divine none. *See Smith (Ellis)*, 451 F.3d at 1351 (noting conditions under which VA's interpretation as set forth in litigation documents and proceedings is entitled to deference); *see also Auer,* 519 U.S. at 461-62. Thus, in light of the lack of clear legislative history on this subject and VA's own plainly erroneous and

_____

5. During oral argument, in an attempt to clarify the limits of the Secretary's bright-line interpretation, the Court asked a series of questions. The Secretary's responses only served to confirm the Court's conviction that VA's interpretation is unreasonable, and when applied, results in such disparate outcomes that it cannot be said to comport with Congress's intent in enacting 38 U.S.C. § 1116(f). When asked to apply the regulatory interpretation in the case of a veteran who was in the waters off of Vietnam, in such sufficient depth of water that his feet did not touch the seabed, versus a veteran who was in the waters off of Vietnam and was able to touch the seabed, the Secretary responded that neither veteran would be entitled to the presumption because the regulatory definition is limited to those veterans "who set foot on land, if you will boots on ground, not touching the ocean floor." Furthermore, when asked whether there was a rational distinction between the case of a veteran aboard a vessel floating up an inland body of water such as a river (which, according to the Secretary's argument, could be miles wide), who never touched land within the geographic area of Vietnam, and a veteran who served on a ship within 100 feet of the shoreline who never touched the land, the Secretary simply responded without rationale that the latter form of service would not warrant application of the presumption. Finally, when asked whether the issue was if the veteran had been subject to being sprayed with Agent Orange, the Secretary simply reiterated that the veteran in this case, who testified that he had served within close proximity to the shore, did not have service in the Republic of Vietnam according to the regulatory definition. Thus, when further given the opportunity to provide a reasoned basis for this bright-line rule, the Secretary could not.

underinclusive interpretation, the Court concludes that § 3.307(a)(6)(iii) must be read to include at least service of the nature described by the appellant, that is, service in the waters near the shore of Vietnam, without regard to actual visitation or duty on land in the Republic of Vietnam. Furthermore, this interpretation is supported by VA's M21-1 provisions, as outlined earlier, regarding the application of the presumption in claims for service connection based on exposure to herbicides.

### 4. Unreasonable Interpretation of Regulation

Finally, the Court notes that VA also has not provided valid or thorough reasoning for either its present interpretation of what constitutes "service in the Republic of Vietnam," or the difference in construction of the definition among the various regulations incorporating the definition. *See Skidmore*, *supra*. In September 1993, pursuant to the congressional mandate of the 1991 act, VA proposed deleting § 3.311a and replacing it with § 3.307(a)(6)(iii). In its notice of proposed rulemaking, VA reported that its regulations addressed the issue of diseases resulting from herbicide exposure under two separate sets of criteria, at 38 C.F.R. §§ 3.307 and 3.309 (implementing the statutory presumption established by Congress under Public Law 102-4), and at 38 C.F.R. § 3.311a, which established service connection on the basis of exposure to herbicides containing dioxin pursuant to Public Law 98-542. VA noted that since "[s]ection 10 of Public Law 102-4 amended Public Law 98-542 by removing the provisions concerning dioxin exposure . . . there is . . . no need for VA to maintain separate regulations on this issue." 58 Fed. Reg. 50,528, 50,529 (Sept. 28, 1993). VA therefore proposed "to amend 38 C.F.R. § 3.307(a)(6) so that it . . .[b]ases the presumption of service connection on exposure to certain herbicide agents rather than on service in the Republic of Vietnam during the Vietnam era as it currently does, . . . [and] incorporates the definition of the term 'service in the Republic of Vietnam' from 38 C.F.R. § 3.311a." *Id.* No comments were reported received, and the regulation was adopted without change. *See* 59 Fed. Reg. 5106 (Feb. 3, 1994) (noting that 38 C.F.R. § 3.307(a)(6)(iii) defines "service in the Republic of Vietnam" as including "service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam"). The notice of proposed rulemaking, as well as the notice of the final rule, does not contain any explanation indicating that VA viewed this regulation as limiting application of the presumption to those who actually set foot on land in the Republic of Vietnam. The Court notes that 38 C.F.R. § 3.313, promulgated in 1990 and also defining "service

22

in the Republic of Vietnam," was neither amended nor removed by this change and remains in effect today. *See id.; see also* 38 C.F.R. § 3.313 (2005). The variance in form of these regulatory provisions defining "service in the Republic of Vietnam," as discussed earlier, leaves the Court to ponder, what, exactly, VA intended in seeking to fill the gap left by section 1116(f). *See supra* at 9. The critical ambiguity in VA's interpretation of its defining regulation similarly leaves veterans and VA adjudicators to puzzle over how the regulation should be applied.

Furthermore, on July 9, 2001, when VA added diabetes mellitus, the disease for which the appellant seeks service connection, to the list of presumptive conditions, it noted, in addition to VA's previous interpretation (although not set forth explicitly during prior rulemakings, as evident above), that the term "service in the Republic of Vietnam" is construed as including service in the inland waterways, but not service in waters offshore unless such service involved duty in or visitation to the Republic of Vietnam. *See* 66 Fed. Reg. 23,166 (July 9, 2001). In response to a comment that specifically requested that VA include service in the waters offshore of Vietnam, VA relied on the argument that, since the regulation predated the enactment of 38 U.S.C. § 1116(f), Congress could not have intended to broaden the definition. The Court has already found this argument unpersuasive. In addition, without citing any authority or evidence supporting its apparent contention that exposure was more prevalent among Vietnam-era veterans who had spent some time on land, no matter how fleeting, VA declined to make a change to its proposed regulation on the basis that "the commenter cited no authority for concluding that individuals who were serving in the waters offshore of the Republic of Vietnam were subject to the same risk of exposure as those who served within the geographic boundaries of the Republic of Vietnam." *Id.* It is not a commenter's responsibility to provide a rationale for VA policy; rather, it is the agency's obligation to account for the relevant data and provide an explanation for its decision. *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

Absent any discussion regarding the scientific studies mandated by Congress on this subject or any other evidence that contributed to VA's decision to limit the definition, the Court can only conclude that VA's asserted interpretation of this regulation is not the product of agency expertise. Applying this interpretation, VA would afford the presumption of exposure to Agent Orange to a Vietnam-era veteran who served only in the inland waterways of the Republic of Vietnam and never

23

set foot on land; yet, in order for a Vietnam-era veteran serving in the waters surrounding Vietnam to be entitled to the presumption, he or she must have set foot on land, without consideration as to either the length of time spent patrolling in the waters offshore, or the risks of windblown exposure to Agent Orange sprayed along Vietnam's coastline. Likewise, a staff officer whose only contact with the Republic of Vietnam was a one-hour stop at the airport at Saigon would be entitled to the presumption of exposure to herbicides, but a service member who spent months patrolling the nearshore coastline of the Republic of Vietnam without setting foot on its soil, would not.

Furthermore, these distinctions do not comport with the legislators' view of the purpose of the 1984 act (which set forth VA's authority to promulgate such regulations), as expressed by Senator Simpson, that veterans "have their exposure claims adjudicated under uniform and consistent regulations that incorporate rational scientific judgments." 130 CONG. REC. S13,591 (daily ed. Oct. 4, 1984). Given Congress's express concern that exposure to Agent Orange could not be determined by tracking troop movements, and VA's acknowledgment that it could not pinpoint exactly who may have been exposed to dioxin despite the fact that many of the 2.4 million troops were deployed in or near locations where Agent Orange was sprayed, it is clear to the Court that VA's interpretation of its regulatory definition fails to consider an important aspect of the problem contemplated by both Congress and VA: the inability to determine exactly who was exposed to Agent Orange. Therefore, the Court cannot conclude that VA was either thorough in its consideration of this most recent interpretation of this definition, or that its reasoning is valid. *See Martin* and *Skidmore*, both *supra*.

D. Effect of M21-1 Provisions

*1. M21-1 provisions are substantive in nature.*

The Secretary maintains that the M21-1 provisions allowing for application of the presumption of service connection based on receipt of the VSM are interpretive in nature and merely exist to provide guidance in adjudicating claims; thus, the regulatory definition should control the outcome in this instance. *See* Sec'y Suppl. Br. at 16. Even if the regulation were clear, which we have already determined it is not, the Court cannot agree. The Court has held, in cases similar to the instant matter, that where the M21-1 provision does not merely clarify or explain an existing rule or statute but "prescribes what action must be taken in the initial levels of adjudication," the rule is substantive rather than procedural and has the force and effect of law. *Fugere v. Derwinski*,

24

1 Vet.App. 103, 107 (1990); *see Hamilton v. Derwinski*, 2 Vet.App. 671, 675 (1991) (holding that "[s]ubstantive rules, those which have the force of law and narrowly limit administrative action, in the VA Adjudication Procedure Manual are the equivalent of Department Regulations"). Such is the case in the instant appeal.

The Secretary argues that should the Court be persuaded that the M21-1 provisions are substantive, then this case is similar to that discussed in *Dyment v. Principi*, 287 F.3d 1377, 1381 (Fed. Cir. 2002), in which the Federal Circuit determined that M21-1, part VI §7.68(b)(2), did not create a presumption of exposure to asbestos and was simply an interpretive rule not subject to the notice and comment process dictated by 5 U.S.C. § 553(a). *Dyment*, 287 F.3d at 1381 (holding not substantive in nature an M21-1 provision, which merely alerted adjudicators to the fact that veterans who served in U.S. Naval shipyards during WWII might have a greater incidence of exposure to asbestos, and, thus, a more extensive review of their service records should be conducted). Similarly, the Secretary maintains that M21-1, part III, paragraph 4.24(g), provides only advisory guidelines for the adjudication of herbicide exposure claims.

The M21-1 provision in this instance, however, does more than merely caution adjudicators as to the possible exposure to herbicides for Vietnam-era veterans; it instructs adjudicators to apply the presumption in cases in which the veteran received the VSM. It creates additional criteria not present in the statute or regulation that would warrant application of the presumption, which, when applied, dictate the award of service connection and, thus, establish entitlement to a monthly monetary benefit. *See Walters v. Nat'l Assoc. of Radiation Survivors*, 473 U.S. 305, 312 (1985) (acknowledging that VA benefits are similar to the Social Security benefits the Supreme Court addressed in *Matthews v. Eldridge*, 424 U.S. 319, 332-33 (1976), and determined that the continued receipt of such benefits is a property interest protected by the fifth amendment). Thus, the Court cannot conclude that this provision is merely interpretive in nature. Rather, it is substantive and has the force and effect of law, indistinguishable from an agency regulation promulgated through the appropriate public notice and comment process.

The Court is not persuaded by the Secretary's argument that the earlier M21-1 provision conceding qualifying service if the veteran was awarded the VSM "in the absence of contradictory evidence" was intended to indicate that "evidence to the contrary" included evidence that the

25

recipient never set foot on Vietnamese soil. Were this the case, there would be no need for the provision of subparagraph (2), which requires analysis of a ship's operating environment for those who served offshore and did not receive the VSM. Rather, it appears to the Court that it is far more reasonable to interpret this provision as conceding service for the purpose of application of the presumption unless there was evidence that the recipient of the VSM had received it for service in a neighboring country or location that reasonably precluded exposure to Agent Orange.

### 2. Failure to Comply with 5 U.S.C. § 553

The Secretary argues that should the Court be persuaded that the M21-1 provisions in effect at the time the appellant filed his claim are substantive in nature, those provisions must be considered void since they were not promulgated pursuant to the requirements of 5 U.S.C. § 553(a). *See* Sec'y Suppl. Br. at 20. It is surprising that the Secretary should make such an argument, attempting to benefit from an assertion of his own noncompliance with the law. *See Fugere*, 1 Vet.App. at 109-10 (striking down the same argument as applied to an attempted rescission of an M21-1 provision). Additionally, the Secretary argues that the pre-February 2002 M21-1 provisions should not be enforced in this instance because they do not comply with the statutory authority since they do not address physical presence on land. This argument must also fail because, as noted above, the term "service in the Republic of Vietnam" is sufficiently vague that it does not mandate actual physical presence on land in either the statute or the Secretary's regulations. In cases such as this, where VA has failed to comply with the APA, 5 U.S.C. § 553(a), and afford veterans notice and opportunity to comment regarding the promulgation and rescission of substantive rules, VA regulations require that "no person shall be required to resort to, or be adversely affected by any matter required to be published . . . in the Federal Register and not so published." 38 C.F.R. § 1.551(c). Accordingly, the February 2002 attempted rescission was "without observance of procedure required by law" and is set aside pursuant to 38 U.S.C. § 7261(a)(3)(D). Consequently, the M21-1 provision in effect prior to the February 2002 rescission is binding on the Agency. *See Hamilton*, 2 Vet.App. at 675; *Fugere*, 1 Vet.App. at 107.

### 3. Applying the Appropriate M21-1 Provisions

At the time the appellant filed his claim in August 2001, the M21-1 provision in effect since 1991 allowed for application of the presumption based on receipt of the VSM, except under the

General Counsel's interpretation that it did not apply in cases where the veteran participated in high altitude flights only. In February 2002, VA replaced that provision with a provision that clearly spelled out VA's limited current interpretation of its own regulation, as follows:

(1) It may be necessary to determine if a veteran had "service in Vietnam" in connection with claims based on exposure to herbicide agents. *A veteran must have actually served on land within the Republic of Vietnam* . . . to qualify for the presumption of exposure to herbicides. . . . The fact that a veteran has been awarded the Vietnam Service Medal does not prove that he or she was "in country." Service members who were stationed on ships offshore, or who flew missions over Vietnam, but never set foot in-country were sometimes awarded the Vietnam Service Medal. . . . .

(2) If a veteran claims service connection for exposure to herbicide agents, and alleges service on a ship in the waters offshore of Vietnam, review the record for evidence that the ship was in the waters off Vietnam *and that the veteran's service involved duty or visitation on land.* If the veteran cannot produce evidence of this, request verification from the Navy.

M21-1, pt. III, para. 4.24(e)(1)-(2), change 88 (Feb. 27, 2002) (emphasis added).

Because these M21-1 provisions have the force and effect of Department regulations, the Court will apply its caselaw regarding changes in the law during the course of a claim's processing and adjudication. The Court has previously held that "where the law or regulation changes after a claim has been filed or reopened but before the administrative or judicial appeal process has been concluded, the version most favorable to the appellant . . . will apply unless Congress provided otherwise or permitted the Secretary to do otherwise and the Secretary did so." *Karnas v. Derwinski*, 1 Vet.App. 308, 313 (1991), *overruled on other grounds by Kuzma v. Principi,* 341 F.3d 1327, 1328 (Fed. Cir. 2003). The Federal Circuit clarified this rule in *Kuzma*, *supra*, by holding that a statute may have such a retroactive effect if Congress clearly intends that result. *Kuzma,* 341 F.3d at 1328 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272-73 (1994), and holding that section 3(a) of the Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096, could not be applied retroactively because Congress made no mention of such an intention). The application of an amended regulation will be deemed to have a retroactive effect "when a substantive right [is] taken away or narrowed," or "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf,* 511 U.S. at 280; *see Stolasz v. Nicholson*, 19 Vet.App. 355, 360 (2005); *Rodriguez v.*

*Nicholson*, 19 Vet.App. 275, 287 (2005) (determining that the application of amended 38 C.F.R. § 3.22 would take a substantive right from the appellant).

In this instance, there is no congressional mandate authorizing a retroactive application of the February 2002 version of M21-1, part III, paragraph 4.24(e). Furthermore, application of the February 2002 M21-1 provision deprived the appellant of a substantive right to the application of the presumption of exposure to herbicides based upon his receipt of the VSM, which would have been applied under the M21-1 version in effect at the time the appellant filed his claim. Accordingly, even if the February 2002 provision was deemed to be in accordance with law, its application in this instance would have an impermissible retroactive effect, which would require that the Court remand for application of the appropriate M21-1 provision.

### E. Consideration of Direct and Secondary Service Connection

The Secretary has conceded that a remand is warranted because the Board failed to evaluate the appellant's claim under direct service connection principles. Given the evidence of diabetes mellitus symptomatology during service and within one year after service, as outlined *supra*, the Court agrees. However, because of the Court's reversal as to the Board's determination that the appellant was not entitled to the presumption of exposure to herbicides, such consideration is not necessary upon remand. Although the appellant requests that we remand this matter with instructions to award service connection, we are not in a position to do so.

The appellant is correct that the Board, in its decision, did not challenge his diagnosis of diabetes mellitus. However, 38 C.F.R. § 3.307(a)(6)(ii) does not allow for presumptive service connection for any of the listed diseases unless the disease has "become manifest to a degree of 10 percent or more at any time after service." In this case, there has not yet been a determination that the appellant's diabetes mellitus is disabling to a compensable degree. *See* 38 C.F.R. § 4.120, Diagnostic Code 7913 (2005) (detailing the requirements for a compensable disability rating for diabetes). Accordingly, an award of service connection at this time would be premature and remand is the appropriate remedy. *See Elkins v. Gober,* 229 F.3d 1369, 1377 (Fed. Cir. 2000); *see also Majeed v. Nicholson*, 19 Vet.App. 525, 530 (2006) (noting that the Secretary must make the initial determination of whether a disability rises to a level that makes it compensable).

28

Upon remand, the appellant is free to argue this issue, and present any additional evidence and arguments to the Board, and the Board is required to consider them. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002); *Kutscherousky v. West*, 12 Vet.App. 369, 372 (1999) (per curiam order). Additionally, should the Board award service connection for diabetes mellitus, the Court expects that the proper procedure will be afforded to the appellant's claims for secondary service connection for peripheral neuropathy, nephropathy, and retinopathy, all claimed as residuals of diabetes mellitus. *See* R. at 5 (noting that the Board found that "VA clincial records beginning in 2000 reveal diagnoses of type-II diabetes, peripheral neuropathy, nephropathy, and retinopathy, thereby satisfying the initial element of a service-connection claim"). The Secretary is expected to provide expeditious treatment of these matters pursuant to 38 U.S.C. §§ 5109B, 7112.

## IV. CONCLUSION

After consideration of the appellant's and the Secretary's briefs, oral argument as presented on January 10, 2006, and a review of the record on appeal, the Court finds that VA's regulation defining "service in the Republic of Vietnam," 38 C.F.R. § 3.307(a)(6)(iii), is permissible pursuant to *Chevron*; however, the regulation is ambiguous. VA's argued interpretation of the regulatory term "service in the Republic of Vietnam," affording the application of the presumption of exposure to herbicides only to Vietnam-era veterans who set foot on land and not to the appellant, is inconsistent with longstanding agency views, plainly erroneous in light of legislative and regulatory history, and unreasonable, and must be SET ASIDE. In this case, the M21-1 provision allowing for the application of the presumption of exposure to herbicides based on the receipt of the VSM controls.

The February 2004 Board decision, therefore, is REVERSED to the extent that the Board denied the appellant the presumption of exposure to herbicides and the matter is REMANDED with instructions to apply the presumption in a manner consistent with the interpretation set forth in this opinion. If service connection for diabetes mellitus is awarded upon remand, VA should ensure appropriate processing of the appellant's claims for secondary service connection for peripheral neuropathy, nephropathy, and retinopathy, claimed as residuals of diabetes mellitus. Furthermore, M21-1, part III, paragraph 4.24(e), change 88 (Feb. 27, 2002), is SET ASIDE pursuant to 38 U.S.C. § 7261(a)(3)(D).